# United States Court of Appeals for the Federal Circuit

———————————

**WESTROCK VIRGINIA CORPORATION,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

———————————

2018-1877

———————————

Appeal from the United States Court of Federal Claims in No. 1:15-cv-00355-LKG, Judge Lydia Kay Griggsby.

———————————

OPINION ISSUED:  June 28, 2019
OPINION MODIFIED: November 4, 2019[*]

———————————

JERRY STOUCK, Greenberg Traurig LLP, Washington, DC, argued for plaintiff-appellant.  Also represented by PAMELA J. MARPLE, MICHAEL J. SCHAENGOLD.

ANDREW M. WEINER, Tax Division, United States Department of Justice, Washington, DC, argued for

———————————

[*]  This opinion has been modified and reissued following a combined petition for panel rehearing and rehearing en banc filed by Appellant.

defendant-appellee.    Also    represented    by    GEOFFREY
KLIMAS, BRUCE R. ELLISEN, RICHARD E. ZUCKERMAN.

————————————

Before NEWMAN, LINN, and WALLACH, *Circuit Judges.*

LINN, *Circuit Judge.*

WestRock Virginia Corporation ("WestRock") appeals a
decision of the United States Court of Federal Claims
("Claims Court") affirming the Department of the Treas-
ury's award of a cash grant to WestRock in an amount that
WestRock contends is less than the grant amount required
under Section 1603 of the American Recovery and Rein-
vestment Act of 2009 ("Section 1603"). *WestRock     Va.
Corp. v. United States*, 136 Fed. Cl. 267 (2018).  Because
the Claims Court correctly determined that the amount of
Treasury's grant award was consistent with Section 1603,
we affirm.

I

In 2009, President Obama signed the American Recov-
ery and Reinvestment Act ("Recovery Act") into law to en-
courage investments in clean energy property.  Pub. L. No.
111-5, 123 Stat 115, 115–16 ("The purposes of this Act in-
clude . . . invest[ing] in transportation, environmental pro-
tection, and other infrastructure that will provide long-
term economic benefits.").  At the time of enactment, Sec-
tion 48 of the Internal Revenue Code ("IRC" or "Code") al-
ready encouraged such investments by providing lump
sum, investment tax credits for certain qualifying property.
But, because tax *credits* are beneficial only if one is already
generating income, Congress enacted Section 1603 of the
Recovery Act to create an alternate program that provides
*cash* grants in lieu of a tax credit to investors for certain
qualifying investments.  *See* H.R. Rep. No. 111-16 at 620–
21 ("It is intended that the grant provision mimic the oper-
ation of the credit under [IRC] section 48.").  Section 1603,

which is administered by Treasury, recites, in relevant part:

SEC. 1603. GRANTS FOR SPECIFIED ENERGY PROPERTY IN LIEU OF TAX CREDITS.

(a) IN GENERAL.—Upon application, the Secretary of the Treasury shall, subject to the requirements of this section, provide a grant to each person who places in service specified energy property to reimburse such person for a portion of the expense of such property as provided in subsection (b).

* * *

(b) GRANT AMOUNT.—

(1) IN GENERAL.—The amount of the grant under subsection (a) with respect to any specified energy property shall be the applicable percentage of the basis of such property.

(2) APPLICABLE PERCENTAGE.—For purposes of paragraph (1), the term "applicable percentage" means—

(A) 30 percent in the case of any property described in paragraphs (1) through (4) of subsection (d), and

(B) 10 percent in the case of any other property.

* * *

(d) SPECIFIED ENERGY PROPERTY.—For purposes of this section, the term "specified energy property" means any of the following:

(1) QUALIFIED FACILITIES.—Any qualified property (as defined in section 48(a)(5)(D) of the Internal Revenue Code of 1986) which is part of a

> qualified facility . . . described in [§ 45(d)(3)] of such Code.

Pub. L. No. 111-5, 123 Stat. 115, 364–65 (emphases added).

Section 48(a)(5)(D) of the Internal Revenue Code, in turn, defines "qualified property" in relevant part as "tangible property (not including a building or its structural components), but only if such property is *used as an integral part* of the qualified investment facility," and IRC § 45(d)(3) defines "qualified facility" as a "facility *using open-loop biomass to produce electricity*." *Id.* (emphasis added). In sum, Section 1603 provides for a grant in the amount of 30 percent of the basis or cost of any qualified property that is used as an integral part of a facility that uses open-loop biomass to produce electricity.

## II

WestRock runs a paper mill in Covington, Virginia. Previously, this paper mill was fueled by steam produced from eight boilers that burned various types of fuel, including fossil fuels and black liquor (a non-biomass fuel derived from the pulping process). In 2013, WestRock placed into service a cogeneration facility that burns open-loop biomass, i.e. material not originally intended for use as a fuel source. This facility uses two boilers to provide steam—a new biomass-fired boiler and an old boiler from WestRock's paper mill. The steam produced from both boilers is comingled and fed into a steam turbine generator. The generator then uses the steam to generate electricity. WestRock diverts some of the steam from the generator to the paper mill for use in the industrial paper process. *WestRock*, 136 Fed. Cl. at 270 (citing J. App'x 378–79). While WestRock disputed this last point before the Claims Court, it does not do so on appeal. It is therefore undisputed that not all the steam that is fed into the generator is used to generate as much electricity as it is capable of producing.

On December 23, 2013, WestRock submitted a Section 1603 application to Treasury seeking payment in connection with its open-loop biomass cogeneration facility. In the application, WestRock claimed that its qualifying property cost $286,191,571 and requested a payment of $85,857,471—30 percent of the total claimed qualifying cost. The National Renewable Energy Laboratory ("NREL") reviewed the application and determined that WestRock's facility produced both process steam and electricity. NREL subsequently determined, based on further information provided by WestRock, that WestRock used only 49.1 percent of the energy in the steam produced at the facility to produce electricity and that fossil fuel still comprised about 0.22 percent of the total fuel used in WestRock's boiler. Accordingly, Treasury determined, "based on the information provided[,] that the energy property uses open-loop biomass to produce electricity at a value equivalent to 48.8% of the total steam and electricity produced from biomass and fossil fuel." J. App'x 722. Therefore, Treasury reduced the cost basis by 51.2 percent, and, after statutory sequestration of certain funds, awarded WestRock $38,881,758—30 percent of the cost of what Treasury deemed qualifying property.

WestRock filed suit at the Claims Court challenging Treasury's award amount and alleging that Treasury improperly reduced the cost of the property based on use of that property. The parties filed cross motions for partial summary judgment on the issue of whether Treasury may reduce WestRock's cost basis under Section 1603(b)(2)(A). The Claims Court found, based on the statutory text, that Section 1603 provides for reimbursement of only those costs associated with electricity production at WestRock's open-loop biomass facility. The Claims Court also found that its conclusion was consistent with applicable, but non-binding Treasury guidance, which provides for allocation of the cost basis between qualifying and non-qualifying activities. The Claims Court determined that this guidance

should be afforded deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). Accordingly, it affirmed Treasury's grant amount. WestRock appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(3) (2012).

## III

Statutory interpretation is question of law that we review *de novo*. *Belkin Int'l, Inc. v. Kappos*, 696 F.3d 1379, 1381 (Fed. Cir. 2012). The Supreme Court generally interprets statutes exempting parties from taxes or providing tax deductions narrowly. *See INDOPCO, Inc. v. Comm'r*, 503 U.S. 79, 84 (1992) ("[T]his Court has noted the familiar rule that an income tax deduction is a matter of legislative grace and that the burden of clearly showing the right to the claimed deduction is on the taxpayer." (internal citations and quotations omitted)); *Helvering v. Nw Steel Rolling Mills, Inc.*, 311 U.S. 46, 49 (1940) ("It has been said many times that provisions granting special tax exemptions are to be strictly construed."). While Section 1603 is not strictly such a statute, it similarly reimburses parties in lieu of a tax credit to promote the use of clean energy resources.

The parties agree that Section 1603(b)(2)(A) provides for reimbursement of 30 percent of the cost of any qualified property—as defined in section 48(a)(5)(D) of the Code—that is part of a qualified facility—as defined in Section 45(d)(3) of the Code. They disagree, however, on whether Treasury may determine the basis or cost of the qualified property based on the use of that property. We conclude that Section 1603(b)(2)(A) unambiguously allows Treasury, in calculating the amount of the grant specified in the statute, to reduce the basis of qualified property in proportion to its use in a qualifying activity. The statute's plain text, underlying purpose, and legislative history support this conclusion.

By incorporating the phrase "integral part" into the definition of "qualified property," Section 1603 allows for

reimbursement of costs associated with a qualifying activity. As noted above, section 48(a)(5)(D) of the Internal Revenue Code defines "qualified property" in relevant part as "tangible property (not including a building or its structural components), but only if such property *is used as an integral part of* the qualified investment facility." *Id.* (emphasis added). And IRC § 45(d)(3) defines a "qualified facility" as, *inter alia*, a "facility *using open-loop biomass to produce electricity*." *Id.* (emphasis added). The plain text of Section 1603 incorporates definitions from the Internal Revenue Code that make clear that the use of the property should be considered in determining the basis for purposes of computing the amount of the grant. Thus, we agree with the Claims Court that the statutory language allows for reimbursement in the amount of 30 percent of only those costs associated with producing electricity.

This reading is also supported by the purpose underlying the Recovery Act. As explained above, when enacting Section 1603, Congress intended to provide an alternative to the types of benefits provided under IRC § 48 for similar types of clean energy investments. Section 48 of the Code, like Section 1603, defines property that qualifies for an investment tax credit according to its use. *See* IRC § 48(a) (providing an "energy credit" of "30 percent in the case of" "energy property," which is defined as "equipment which uses solar energy to generate electricity, to heat or cool (or provide hot water for use in) a structure, or to provide solar process heat, excepting property used to generate energy for the purposes of heating a swimming pool.").

In administering IRC § 48, Treasury promulgated regulations that similarly allocate the cost of the property according to use of that property. For example, Treas. Reg. 1.48-9(e) defines "wind energy property" as equipment "that performs a function described in paragraph (e)(2)," which, in turn, limits the tax credit to equipment that "[u]ses wind energy to heat or cool, or provide hot water for use in, a building or structure" or "[u]ses wind energy to

generate electricity." Similarly, Treas. Reg. § 1.48-9(d)(4) states that "[p]ipes and ducts that are used to carry both energy derived from solar energy and energy derived from other sources" are eligible for tax credit as solar energy property "only to the extent of their basis or cost allocable to their use of solar energy during an annual measuring period." Finally, Treasury Regulation § 1.48-9(d)(8) includes examples of equipment that qualify as solar energy property. These examples similarly reduce the cost or basis of the property according to an allocation of its uses. Specifically, one example notes that certain equipment that "serve the oil-fired water heater as well as the solar energy equipment" qualify for the tax credit "only to the extent of eighty percent of their cost or basis," i.e. "the portion allocable to use of solar energy." *Id.* Thus, Treasury's regulations administering the investment tax credit under IRC § 48 allocate the cost or basis similar to how Treasury allocated the cost or basis under Section 1603 here—that is, based on what Treasury deems are qualifying activities under the statute.

Because Congress legislated against this regulatory backdrop when it enacted Section 1603 and because Section 1603 provides a cash grant *in lieu* of a tax credit under IRC § 48, we conclude that Congress intended that Treasury award grants under Section 1603 similar to how it has always awarded tax credits under Section 48—i.e., by fairly allocating the basis according to the use of that property. *See Gazelle v. Shulkin*, 868 F.3d 1006, 1011 (Fed. Cir. 2017) ("Congress 'legislate[s] against the backdrop of existing law.'" (citation omitted)). Indeed, in the legislative history accompanying the Recovery Act, Congress stated that "[i]t is intended that the grant provision mimic the operation of the credit under section 48." H.R. Rep. No. 111-16 at 621. Thus, as the government notes, while Congress provided another *form* of subsidy to owners of open-loop biomass facilities when it enacted the Recovery Act—a lump

sum cash grant rather than a lump sum investment tax credit—it did not change *what* it was subsidizing.

Finally, our interpretation finds support in the legislative history. A conference report accompanying the Act explains, when discussing the relevant portion of Section 1603, that the statute provides for a grant payment for property that is "an electricity producing facility." H.R. Rep. No. 111-16, at 620–21 (Feb. 12, 2009) (Conf. Rep.). It further states that:

> An income tax credit is allowed for the *production of electricity* from qualified energy resources at qualified facilities (the "renewable electricity production credit"). Qualified energy resources comprise . . . open-loop biomass . . . . Qualified facilities are, generally, facilities that *generate electricity* using qualified energy resources.

*Id.* at 620 (emphasis added). These statements from the legislative history illuminate Congress's intent when enacting the statute. Specifically, they demonstrate that Congress intended to promote the use of clean energy resources *for the production of electricity*. This is consistent with the plain text of the statute and lends further support to the government's reading.

WestRock argues that, while the statute establishes that a qualified facility must use open-loop biomass to produce electricity, it does not allow Treasury to allocate cost based on the percentage of steam used to actually produce electricity. According to WestRock, once it has been established that the qualified property uses biomass to produce electricity, Treasury must blindly reimburse WestRock for 30 percent of the total cost of that property. We disagree. Not only does this read out the phrase "integral part" from the Internal Revenue Code, it also produces an absurd result. Under WestRock's reading of the statute, any owner that uses its property to produce even a small amount of electricity would be reimbursed for 30 percent of the cost of

that property even if the property is in large part used for purposes entirely unrelated to the production of electricity. This is not the result Congress intended when it enacted Section 1603. *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available.").

Finally, WestRock contends that the Claims Court erred when it relied on Treasury guidance and *Skidmore* deference to uphold Treasury's grant amount. Because we conclude that Treasury's grant amount is consistent with Section 1603 based on an unambiguous reading of the statute, we need not resort to agency deference, and thus, need not reach WestRock's argument.

## CONCLUSION

For the reasons stated above, we affirm the Claims Court's conclusion that the amount of Treasury's grant award was consistent with Section 1603.

## **AFFIRMED**

### COSTS

No costs.