# United States Court of Appeals for the Federal Circuit

---

**CALIFORNIA RIDGE WIND ENERGY LLC, INVENERGY WIND LLC, BISHOP HILL ENERGY LLC,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2019-1463, 2019-1465

---

Appeals from the United States Court of Federal Claims in Nos. 1:14-cv-00250-RHH, 1:14-cv-00251-RHH, Senior Judge Robert H. Hodges, Jr.

---

Decided: May 21, 2020

---

JOHN C. HAYES, JR., Nixon Peabody LLP, Washington, DC, argued for plaintiffs-appellants. Also represented by BRIAN P. DONNELLY.

CLINT CARPENTER, Tax Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by BRUCE R. ELLISEN, RICHARD E. ZUCKERMAN.

---

Before PROST, *Chief Judge*, MAYER and TARANTO, *Circuit Judges*.

TARANTO, *Circuit Judge*.

California Ridge Wind Energy LLC and Bishop Hill Energy LLC each own a windfarm that was put into service in 2012. Thereafter, each company applied for a cash grant from the federal government, based on specified energy-project costs, under section 1603 of the American Recovery and Reinvestment Tax Act of 2009, Pub. L. No. 111-5, 123 Stat. 306, 364. The United States Department of the Treasury awarded California Ridge and Bishop Hill less than the amounts they had requested, rejecting as unjustified the full amounts of certain development fees included in the submitted cost bases. Each windfarm owner sued the United States in the Court of Federal Claims for the difference between the amounts they had been paid and the amounts allegedly mandated by section 1603. The government counterclaimed, alleging that it had actually overpaid the two firms.

The Court of Federal Claims ruled in favor of the government. *California Ridge Wind Energy, LLC v. United States*, 143 Fed. Cl. 757, 763 (2019); *Bishop Hill Energy, LLC v. United States*, 143 Fed. Cl. 540, 545 (2019).[1] The sole issue on appeal is whether the two firms proved that their proposed development fees, in the amounts asserted, were properly included in their cost bases. The trial court held that they did not. *California Ridge*, 143 Fed. Cl. at 762–63. California Ridge and Bishop Hill appeal on that issue, making no separate argument about the amount of development fees ultimately included in the cost basis if

---

[1]    The two cases were consolidated for trial, and the two opinions are materially identical. *California Ridge*, 143 Fed. Cl. at 759 n.1; *Bishop Hill*, 143 Fed. Cl. at 541 n.1. For simplicity, we generally cite only *California Ridge*.

the trial court properly rejected their proposed amounts. We affirm.

I

Section 1603 requires the Secretary of the Treasury to "provide a grant to each person who places in service specified energy property to reimburse such person for a portion of the expense of such property . . . ." Pub. L. No. 111-5, § 1603(a). The amount of the grant is the "applicable percentage of the basis of such property," *id.*, § 1603(b)(1), which is the cost of the property, 26 U.S.C. § 1012(a). For "qualified small wind energy property," the applicable percentage is thirty percent. Pub. L. No. 111-5, § 1603(b)(2)(A), (d)(4).

California Ridge and Bishop Hill belong to a family of related entities, which we refer to generally as "Invenergy." Invenergy is in the business of creating windfarms. Generally, Invenergy determines what type of facility will be built, acquires the legal entitlements to construct that facility, and ensures that the facility is properly constructed. Invenergy uses various subsidiaries to perform different functions in the creation task; relevant to this appeal are Invenergy Wind North America LLC (IWNA) and Invenergy Wind Development North America LLC (IWDNA). Invenergy also partly or wholly owns or controls, through various subsidiaries, some of the completed windfarms. California Ridge and Bishop Hill each own a namesake windfarm located in central Illinois. Each firm is controlled by Invenergy and owned through a partnership between Invenergy and Firstar Development (USBank).

Development of the Bishop Hill windfarm began in 2005. Development of the California Ridge windfarm began in 2008. Bishop Hill LLC and California Ridge Wind Energy LLC were formed on August 1, 2006, and September 26, 2008, respectively.

On July 18, 2011, years after development work began, Bishop Hill entered into a development agreement with IWNA. J.A. 14783. The agreement states that "IWNA has provided development services to [Bishop Hill] to assist it in developing the Project," including "negotiating construction financing terms, negotiating the project and operational documents necessary or appropriate for the Project, obtaining permits and performing other services relating to the Project." *Id.* In exchange for those services, Bishop Hill was obligated to pay IWNA $60 million. *Id.* California Ridge entered a similar development agreement with IWDNA on February 29, 2012, also long after development of its windfarm began. J.A. 14780. The California Ridge agreement states that "IWDNA has provided and hereby agrees to provide further development services" identical to those listed in the Bishop Hill agreement. *Id.* In exchange, California Ridge was obligated to pay IWDNA $50 million. *Id.*

Payment under the Bishop Hill agreement occurred on July 5, 2012—involving a round trip of funds starting and ending with IWDNA. On that day, IWDNA transferred $60 million to Bishop Hill, which then wired $60 million to IWNA—the entity owed the money under the agreement. The same day, IWNA wired $60 million to IWDNA.

Payment under the California Ridge agreement occurred on November 19, 2012—also involving a round trip of funds starting and ending with IWDNA. On that day, IWDNA transferred $50 million to California Ridge, which then wired $50 million back to IWDNA—the entity owed the money under the agreement.

On August 13, 2012, Bishop Hill applied to Treasury for a section 1603 grant totaling $129,923,109. To support its request, Bishop Hill submitted a breakdown of its direct and indirect costs. Bishop Hill included the $60 million development fee in the indirect costs of its windfarm and, of

that $60 million, allocated $56,956,837 to section-1603-qualified property.  J.A. 1266.

On November 19, 2012, the same day that it paid IWDNA the development fee, California Ridge applied for a section 1603 grant totaling $136,858,980.  To support its request, California Ridge submitted a cost breakdown similar to Bishop Hill's.  Of the $50 million development fee, California Ridge allocated $49,315,067 to section-1603-qualified property.  J.A. 1270.

On October 9, 2012, Treasury awarded Bishop Hill $117,216,098—which was $12,707,011 less than the amount Bishop Hill sought.  Treasury explained:

> The amount requested was reduced because the presented cost basis was higher than open market expectations for projects of this size and in this location and the transaction involved related parties and/or related transactions.  The cost basis has been adjusted to allow for base costs plus an appropriate markup (to include reasonable overhead, profit, and, if appropriate, development fees) resulting in a total that more closely reflects the amount that would have been paid in an arms' length transaction between parties with adverse interests.

J.A. 6525.

On December 5, 2012, Treasury awarded California Ridge $127,699,997—which was $9,158,983 less than the amount California Ridge sought.  Treasury's explanation for the reduction was identical to that given to Bishop Hill.  J.A. 6523.

On March 28, 2014, California Ridge and Bishop Hill each filed a complaint against the United States in the Court of Federal Claims, alleging that Treasury had unlawfully withheld payment mandated by section 1603.  Each sought damages in the amount that Treasury had

reduced its requested awards.  The government counter-claimed, alleging the "development fees" specified in the two development agreements were not includable as eligible costs given the circumstances and characteristics of those non-arm's-length agreements—which the government characterized as "sham" transactions.  The government sought to recover the amounts of the awards attributable to the development fees—$5,635,537 from California Ridge and $4,380,039 from Bishop Hill.

The trial court ruled in favor of the government.  The court determined that California Ridge and Bishop Hill failed to show that the development agreements had economic substance and concluded that the agreements were sham transactions. *California Ridge*, 143 Fed. Cl. at 761–62.  The court determined that California Ridge's evidence—in particular, the "independent certification" of the development fees proffered by California Ridge and Bishop Hill's accounting firm, Deloitte; the development agreement "without quantifiable services"; and the "round-trip wire transfer that began and ended in the same bank account, on the same day"—fell "well short" of showing that the development agreements were not shams and, more generally, that the development-fee amounts stated in those agreements were eligible costs. *Id.* at 762.  Accordingly, the court dismissed California Ridge's and Bishop Hill's complaints and entered judgment for the government in the amounts it sought. *Id.* at 763; *see* J.A. 1–2.

California Ridge and Bishop Hill timely appealed, and we consolidated the appeals.  We have appellate jurisdiction under 28 U.S.C. § 1295(a)(3).  The Court of Federal Claims had jurisdiction over the claims under the Tucker Act, 28 U.S.C. § 1491(a)(1); as is undisputed, section 1603 is a money-mandating statute.  The trial court also had jurisdiction over the overpayment-based counterclaims. 28 U.S.C. §§ 1503, 2508.

II

On appeal, California Ridge[2] argues that the Court of Federal Claims failed to make sufficient findings of fact to allow this court to meaningfully review its decision, that the facts it did find are clearly erroneous, and that its conclusion that the development agreements were sham transactions is a legal error. If those errors are corrected, California Ridge argues, it is entitled to the amount of the section 1603 grants disallowed by Treasury. California Ridge presents no separate challenge to the court's award if the development fee amounts were properly disregarded.

As the Court of Federal Claims concluded, and California Ridge has not meaningfully disputed on appeal, it was California Ridge's burden to justify the amount of the development fee it claimed in support of the grant amount (30% of the eligible costs) it sought. *See California Ridge*, 143 Fed. Cl. at 760; *see WestRock Virginia Corp. v. United States*, 941 F.3d 1315, 1318 (Fed. Cir. 2019) (invoking for section 1603 the established burden rule for tax deductions); *cf. Alt. Carbon Resources, LLC v. United States*, 939 F.3d 1320, 1328 (Fed. Cir. 2019); *WMI Holdings Corp. v. United States*, 891 F.3d 1016, 1021–22 (Fed. Cir. 2018). The trial court found that California Ridge had not carried that burden. Thus, the question before us is whether the Court of Federal Claims committed reversible error in so finding.

"The characterization of a transaction for tax purposes is a question of law that is subject to de novo review, while the underlying facts are reviewable for clear error." *Salem Financial, Inc. v. United States*, 786 F.3d 932, 940

---

[2] On appeal, there is no material distinction between California Ridge and Bishop Hill. For simplicity we use "California Ridge" to refer to both parties, unless otherwise noted.

(Fed. Cir. 2015). "A finding is 'clearly erroneous' when[,] although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948). Whether the trial court made sufficient factual findings is reviewed for abuse of discretion.  *See Medtronic, Inc. v. Daig Corp.*, 789 F.2d 903, 906 (Fed. Cir. 1986).

## III

Section 1603 provides for government reimbursement to qualified applicants of a portion of the "expense" of putting certain energy-generating property into service. Pub. L. No. 111-5, § 1603(a).  That expense is measured by the "basis" of such a property, *id.*, § 1603(b)(1), and "basis" is defined as "the cost of such property," 26 U.S.C. § 1012(a).  Accordingly, California Ridge, to support its claim, was required to prove that the dollar amounts of the development fees claimed—stated in the development agreements and paid to IWNA and IWDNA out of IWDNA's own funds—reliably measured the actual development costs for the windfarms.

We read the Court of Federal Claims opinion as finding that the amounts stated in the development agreements do not reliably indicate the development costs.  That finding is not clearly erroneous.  It is sufficiently supported by at least the round-trip nature of the payments; the absence in the agreements of any meaningful description of the development services to be provided; and the fact that all, or nearly all, of the development services had been completed by the time the agreements were executed.

California Ridge argues primarily that the development agreements had economic purpose and that, therefore, the court's holding that those agreements were sham transactions was error.  But that argument does not establish that the trial court erred on the distinct question whether the dollar amounts of those agreements are a

reliable indicator of the true development costs. Because we see no clear error in the trial court's finding on that issue, California Ridge cannot prevail regardless of whether additional proof would be needed to characterize the transactions as shams, an issue we need not address.

## A

Three aspects of the development agreements support the trial court's finding that the agreement-specified development fees do not reliably establish the actual development costs.

First, California Ridge paid the development fees with funds it obtained from another Invenergy subsidiary, resulting in a round-trip transaction in which the funds left from and returned to the same pocket on the same day. As noted by relevant Treasury guidance, "in certain circumstances, a taxpayer's stated cost for an asset does not reflect the true economic cost of that asset to the taxpayer and will be ignored for purposes of determining the basis of the asset." U.S. Dep't of the Treasury, Evaluating Cost Basis for Solar Photovoltaic Properties 1 (2011) (Cost Basis Guidance) (quoting *Bryant v. Comm'r*, 790 F.2d 1463, 1466 (9th Cir. 1986)). This may be the case when "a transaction is not conducted at arm's-length by two economically self-interested parties or where a transaction is based upon peculiar circumstances." *Id.* (quotation marks omitted) (quoting *Lemmen v. Comm'r*, 77 T.C. 1326, 1348 (1981)). Here, not only was the amount of the development fee negotiated between related entities, the fee was paid in a round-trip transaction such that neither the payor nor the payee was materially affected by the transaction. Such circumstances are "peculiar." And substantively, the trial court could reasonably view the agreed amount as not reliably indicating the actual value transferred, since the economic impact on payee or payor of the round-trip movement of money was, if not zero or negligible, wholly unrelated to the dollar figures written into the agreements.

California Ridge contends that the characterization of the payments as nothing more than "round-trip" wire transfers ignores the complicated treatment featured in Invenergy's accounting books. As to the specific California Ridge development fee (as opposed to the Bishop Hill fee): there is evidence that payment was meant to be funded by Invenergy Wind Global—yet another Invenergy entity—but at the time that payment was due, IWDNA happened to be holding the money. J.A. 3387–88. Thus, California Ridge posits that moving the money directly from IWDNA to California Ridge was a transactional shortcut, which left out intermediate steps of moving money up one side of the Invenergy organizational chain and then back down another. J.A. 3314–15. But even if Invenergy intended for the money to come from the pocket of one Invenergy subsidiary and end in the pocket of another, both pockets still are Invenergy's. The trial court could readily find that the transaction, despite any characterization in Invenergy's accounting books, did not change the economic positions of IWDNA or California Ridge in anything like the amount stated in the agreement. *See Frank Lyon Co. v. United States*, 435 U.S. 561, 573 (1978) ("The Court has never regarded the simple expedient of drawing up papers as controlling for tax purposes when the objective economic realities are to the contrary." (internal citation omitted)). As to the specific Bishop Hill fee: there is evidence that the initial payment from IWDNA to Bishop Hill was treated as a loan to IWNA, which IWNA paid back later that day after receiving payment from Bishop Hill, using the money IWDNA gave it. J.A. 3321–22. But even so characterized, the transaction did not change the economic position of any party in anything like the amount stated in the agreement. Therefore, Invenergy's accounting treatment does not undermine the Court of Federal Claims' determination that the development fees are not a reliable indicator of value.

Second, the development agreements lack any meaningful description of the services provided. The

development agreements obligate Invenergy to perform only generic development services: "[n]egotiat[e] construction financing terms, negotiat[e] the project and operational documents necessary or appropriate for the Project, obtain[] permits and perform[] other services relating to the Project." J.A. 14780, 14783. There is no concrete specification of services that, if examined, might lend support to the amount set in the agreement for a premium on those services. And the choice to include only a highly generic description may reasonably be taken to suggest that the fee was not the result of a careful determination of what premium was justified for the particular work done.

It is no answer to say, as California Ridge does, that there is extensive evidence that services were performed that come within the generic descriptions in the agreements. Development services certainly were provided to California Ridge. In its cost-breakdown submitted to Treasury, California Ridge described several categories of indirect costs separately included in the grant request, such as "Development legal," "Internal Development," and "Misc Site Development." J.A. 6530, 6569. And trial testimony provides some further details. *See, e.g.*, J.A. 3288–89 (outside counsel work, for "any number of development activities," including "zoning and permitting"; payroll and travel costs for Invenergy's employees). But the generic character of the service description in the agreement makes it reasonable to find unproven the assertion that the fee amounts set in those agreements were a reliable indicator of the value of the development work.

Third, the development agreements were executed after the development services were substantially completed. The Bishop Hill agreement states that Invenergy "*has provided* development services," J.A. 14783 (emphasis added), while the California Ridge agreement states that Invenergy "*has provided* and hereby agrees to provide further development services," J.A. 14780 (emphasis added). Because the services were already rendered, in full or in large

part, the negotiated price for a premium as part of those services was not part of a pre-acquisition market transaction that would lend the price reliability as an indicator of market value.

The facts we have summarized provide a strong basis for the Court of Federal Claims' determination that California Ridge did not prove that the development fees stated in the agreements were reliable indicators of the development costs. And we see no clear error when we consider the foregoing facts together with California Ridge's additional arguments, discussed next.

B

California Ridge argues that the Court of Federal Claims erred because its sham-transaction determination effectively denies Invenergy the ability to transfer value to California Ridge by selling its services to California Ridge at fair market value. That contention is incorrect. In this case, the trial court could reasonably find, on the particular facts, that the agreement-stated figures do not accurately value eligible costs. That is hardly a general bar to properly valued transactions within the Invenergy family.

California Ridge also argues that the development agreements had economic substance because the economic position of third-party USBank was affected by the round-trip fee payments. But California Ridge forfeited this argument by not raising it below. We may deem an argument forfeited when a party raises it for the first time on appeal. *Personal Audio, LLC v. CBS Corp.*, 946 F.3d 1348, 1354 (Fed. Cir. 2020); *Sage Products, Inc. v. Devon Industries, Inc.*, 126 F.3d 1420, 1426 (Fed. Cir. 1997). California Ridge cites a portion of its closing statement to show that it raised the point to the trial court, Appellants' Reply Br. 15, but those statements were made to explain how USBank would be affected if the development fees were not included in the windfarms' bases, J.A. 3579–80. The cited statements do not show that California Ridge previously argued that the

payment of the development fees affected USBank. Therefore, California Ridge has forfeited the argument.

California Ridge further argues that the development agreements had economic substance because they created a positive net cash flow to Invenergy. The argument that there is some positive net cash flow to Invenergy does not undermine the essential finding on the only issue on appeal—that the agreement-specified figures themselves were not proved to be accurate values for the costs at issue. Indeed, this argument is premised on faulty calculations. At trial, California Ridge's witness Mr. Murphy determined the net cash flow to Invenergy by subtracting Invenergy's equity contribution to each windfarm from the respective development fee. J.A. 3016–26. In turn, Mr. Murphy determined Invenergy's equity contribution by subtracting the amount of third-party funding from the total cost of the windfarm. J.A. 3019–22. When performing this calculation, however, Mr. Murphy used a total facility cost that included the cost of the development fee. *Compare* J.A. 3020 *with* J.A. 6568. The implication of Mr. Murphy's own testimony, it appears, is that the net cash to Invenergy is *independent* of the amount of the development fee. Such an implication undermines, rather than supports, any inference that the amounts of the development fees are a reasonable indication of the development costs.

In addition, California Ridge argues that the independent attestation of its accounting firm, Deloitte, shows that the development agreements have economic substance. But those attestations do not prove that the fees are a reliable indication of cost. In its memo to California Ridge, Deloitte indicated that its examination was "primarily concerned with the potential errors of classification of assets as eligible property and determination of eligible basis . . . ." J.A. 14690. Deloitte's examination of the development fees appears to have been focused on whether the development fees were allocable to grant-eligible costs. And it concluded that Invenergy's assertions that "the full

amount of the development fee is capitalizable to the project assets and that the allocation to basis eligible for Section 1603 grants is appropriate" were reasonable. J.A. 14701. Deloitte did not independently examine and determine whether the dollar amounts of the development fees accurately reflected the value of the premium on development work, as California Ridge claims. Although Deloitte stated that "the amount of the fee is consistent with the amounts paid by other third[-]party investors in other Invenergy projects," it did not aver that the amount of the fee was an accurate measure of cost in this particular circumstance. *Id.*

Lastly, California Ridge argues that the testimony of its expert Mr. Gross shows that the development fees are reliable measures of the value Invenergy provided to the windfarms. In particular, California Ridge argues that Mr. Gross's testimony shows that the amount of the fees was within the range of "appropriate markups" identified by Treasury in certain published guidance. That guidance describes three approaches to determining the appropriate costs basis for purposes of section 1603. Cost Basis Guidance, at 3–4. Under the "cost approach," an applicant "should clearly show the cost buildup, including hard costs, soft costs, and profit." *Id.* at 4. The guidance further provides that an applicant may include a "markup" in its cost basis and that "appropriate markups typically fall in the range of 10 to 20 percent." *Id.* California Ridge argues that the amounts of the development fees fall in that range, when measured as a percent of the other grant-eligible costs. But California Ridge has not established that this is an appropriate reading of the guidance, which specifies that markups are appropriate only when they are consistent with the "scope of the work for which the markup is received." *Id.* That language suggests using a percentage of the cost of the development work provided, rather than of all grant-eligible costs. And, as discussed above, the services in the development agreements are described so

generically as to make it difficult to determine what specific work the development-fee "markups" are tethered to. Therefore, Mr. Gross's testimony that the amounts of the development fees comply with Treasury's guidance does not establish clear error on the trial court's behalf.

We need not decide whether Mr. Gross's testimony—regarding the cost approach or the other approaches for determining basis—might have supported a finding in California Ridge's favor regarding the development fees. The question on appeal is whether we are left with a definite and firm conviction that the trial court erred in finding to the contrary. We are not.

## IV

California Ridge argues that the Court of Federal Claims clearly erred in two findings of fact.

First, it disputes the trial court's finding that Mr. Schueler "did not give testimony specific[ally] related to the development services outlined in the three-page development agreement[s]." Appellants' Br. 18 (quoting *California Ridge*, 143 Fed. Cl. at 761). We conclude, however, that the court's finding is not clearly erroneous in light of the record. The court noted that Mr. Schueler testified that he was "not immediately familiar" with the development agreements. *California Ridge*, 143 Fed. Cl. at 761 (citing J.A. 2911). California Ridge cites many portions of Mr. Schueler's testimony as purportedly showing the extensive development work that he and his team did at the windfarms. Appellants' Br. 18–19. But much of that testimony is about the type of development work that Mr. Schueler did for Invenergy windfarms generally, *see, e.g.*, J.A. 2805–06, 2815–17, and the rest of his testimony, while focused on development work done at the Bishop Hill or California Ridge windfarms, does not indicate any relation between the work done and the development agreements, *see, e.g.*, J.A. 2837–39, 2849–60. Additionally, the documents that California Ridge cites as evidence of the development work

done are all dated earlier than the relevant development agreement, s*ee*, *e.g.*, J.A. 12982–92 (dated May 3, 2011), J.A. 13034–35 (dated June 20, 2011); thus, these documents do not show that the work documented was specifically related to the services outlined in the development agreements. Therefore, the Court of Federal Claims' finding that Mr. Schueler did not give testimony specifically related to the development agreements is not clear error.

Second, California Ridge challenges the court's finding that the developers did not quantify the services provided under the agreements. Appellants' Br. 22–23 (citing *California Ridge*, 143 Fed. Cl. at 762). California Ridge argues that the services to be provided were clearly defined, it was possible to objectively verify whether the services were performed, and the services were quantified by the $50- and $60-million development fees. We understand the challenged trial-court finding, however, as meaning that California Ridge failed to provide any specificity as to what, concretely, was done under the development agreements that would warrant the development-fee premiums in the amounts stated in the agreements. So understood, the finding is not clearly erroneous.

As discussed above, the development agreements obligate Invenergy to perform development services identified only at a very high level of generality. And California Ridge's provided method for determining whether those tasks have been completed is equivalent to a determination that the project has been completed. Such a determination does not show that the development agreements were independently valuable and necessary when there are many other costs—all necessary to the completion of the projects—also accounted for in California Ridge's evidence. Lastly, although California Ridge did provide evidence as to how it arrived at the $50- and $60-million figures, *see* J.A. 2964–78, that evidence does not show that the valuations were reliable. Therefore, the Court of Federal Claims did not clearly err when it found that the development

agreements provide only a general valuation of non-specific services—in its terminology: the services are not "quantifiable." *California Ridge*, 143 Fed. Cl. at 762.

## V

For the foregoing reasons, we affirm the judgment of the Court of Federal Claims.

Costs awarded to the appellee.

**AFFIRMED**